IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **HUDSON SHIPPING LINES, INC** § § | | |
| | § | CIVIL ACTION NO. |
| v. | § § | |
| | § | 22-cv-_____ |
| **SESCO TRADING LTD** | § § | |
| | § | ADMIRALTY RULE 9(h) |
| | § § § | |

# VERIFIED COMPLAINT

Plaintiff HUDSON SHIPPING LINES, INC ("Hudson" or "Owner") files this Verified Complaint against Defendant SESCO TRADING LTD ("Sesco Trading" or "Charterer") and alleges as follows:

## SUBJECT MATTER JURISDICTION

1. This is an admiralty or maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 U.S.C. § 1333.

## PARTIES

2. Hudson is a foreign business entity organized and existing under the laws of Liberia. At all relevant times referred to herein, Hudson was the disponent owner of the vessel MV KASTRO.

3. Upon information and belief, Sesco Trading is a foreign business entity organized under the laws of the Republic of Cyprus, with a principal place of business in Limassol, Cyprus.

# FACTS

**The Voyage Charter**

4. By a voyage charterparty dated October 8, 2020, Owner fixed a vessel to be nominated to Charterer for the carriage of a cargo of bulk cement from Hereke Port in Turkey to "*1 SP SB ALWAYS ACCESSIBLE HOUSTON USA CITY DOCK 3 OPERATED BY SESCO*" ("the Charter").

5. The terms of the Charter are set out in a recap, which incorporates an amended proforma GENCON 1994 form and riders, true and correct copies of which are attached hereto as <u>Exhibit 1</u>.

6. The Charter provides in relevant part as follows:

*- DPORT: 1 SP SB ALWAYS ACCESSIBLE, HOUSTON USA CITY DOCK 3 OPERATED BY SESCO*
*DISCH RATE: 12,000 MT PWWD OF 24 CONS HRS SHINC"*
*- DEMURRAGE: DECLARED WITH THE VESSEL NOMINATION IN LINES WITH THE MARKET BUT MAX USD 16,000 PDPR/HALF DESPATCH WORKING TIME SAVED BE* […]
*- LAYTIME NON-REVERSIBLE* […]
*- LAYTIME WILL STOP COUNTING UPON COMPLETION OF LOADING RESPECTIVELY DISCHARGING."*
<u>Gencon 1994</u>

### 5. Loading/Discharging

*(a) Costs/Risks*
*The cargo shall be […] discharged by the Charterers, free of any risk, liability and expense whatsoever to Owners […].*

7. On or about October 8, 2020, Owners nominated the vessel "KASTRO" ("the Vessel") as the performing tonnage under the Charter and declared the demurrage rate to be US$16,000 pdpr and Charterers accepted the said nomination and demurrage rate.

8. By an addendum dated October 28, 2020, the Charter was amended so as to grant Charterer the option to load min/max 6,000mt of bagged cement at the Damietta Port, Egypt in addition to the bulk cement to be loaded at Hereke Port, Turkey; the said bagged cement to be discharged at the CARE Terminal at Houston, Texas. True and correct copies of the Charter Party (and Addendum), Vessel nomination and acceptance, also attached hereto (in addition to the Recap and GENCON 1994 form and riders) as Exhibit 1.

**Facts giving rise to the Maritime Claim**

9. On or about October 29, 2020, the Vessel loaded her cargo of 39,050 mt of cement in bulk at Hereke ("the Bulk Cargo"). Thereafter she proceeded to Damietta, where she completed loading a further cargo of 5,927.960 mt of bagged cement ("the Bagged Cargo") on or about November 5, 2020. True and correct copies of the three bills of lading, memorializing the foregoing, are attached hereto as Exhibit 2.

10. Thereafter, the Vessel proceeded to the Port of Houston, where she arrived on December 1, 2020.

11. Discharge of the Bagged Cargo at the CARE Terminal in Houston, on Buffalo Bayou, was completed on December 5, 2020, and following the completion of discharge, the Vessel shifted back to anchorage to wait for City Dock 3, the berth designated in the Charter, to become free so that she could discharge the Bulk Cargo.

12. The Vessel first was called into City Dock 3 on December 10, 2020, and discharge of the Bulk Cargo commenced on December 12, 2020 at 1500 hrs.

13. On December 18, 2020, with 24,887 mt of the Bulk Cargo still remaining on board, the Vessel was ordered to leave City Dock 3 and return to anchorage pending further instructions.

14. The Vessel then waited at anchorage until January 11, 2021, when she was called back to City Dock 3 to discharge the remaining Bulk Cargo ("the Second Berthing").

15. Instead of completing discharge, Charterer ceased discharging operations altogether on January 20, 2021 at 1730 hrs, with a substantial quantity of Bulk Cargo remaining on board, and directed the Vessel to leave the berth and to proceed (once more) to anchorage.

16. Given Charterer's failure and refusal to discharge and receive the part of the Bulk Cargo remaining on board, to effect reasonable mitigation, Owner engaged launches to transport the Bulk Cargo to Charterer's terminal and shore labor to discharge the Cargo from the Vessel to the launches, and from the launches to shore. A total of 136 jumbo bags (well over 100 mt) were filled with bulk cement from the Vessel's holds, transferred to nine different launches, and taken ashore. This discharging process was completed between January 20, 2021 and February 2, 2021 at 1550 hrs.

**Breach of the Charter Party**

17. In breach of the Charter, Charterer failed and refused to discharge the bulk cement within the allowed laytime as follows:

   (a) The agreed discharge rate provided for in the Charter was 12,000 mt per weather working day SHINC, and thus on the basis of the Bulk Cargo quantity of 39,050mt, the allowed laytime was 3.254166667 days.

   (b) It is common ground between the parties that laytime expired on December 12, 2020, and that the Vessel was thereafter on demurrage.

(c) Charterer has conceded that demurrage ran until discharge ceased at the berth on January 20, 2021 at 1730 hrs, and have paid the demurrage incurred up to that point.

(d) However, pursuant to the Charter, demurrage continued to run until the completion of discharge, and (as aforesaid) discharge was in fact completed on February 2, 2021 at 1550 hrs.

18. Further or alternatively, in breach of the Charter, in particular clause 5(a) of the incorporated Gencon 1994 form, Charterer failed and refused to discharge the entirety of the Bulk Cargo, and instead ordered the Vessel to depart from City Dock 3 when over 100 mt of the Bulk Cargo remained in the Vessel's holds.

19. Further or in the further alternative, Charterers warranted and undertook that City Dock 3 would be "*always accessible*", such warranty and undertaking covering all aspects of accessibility pertaining to the use of the berth, and not merely entry into it. In breach of warranty, the said berth was not "*always accessible*":

(a) As aforesaid, the Vessel was ordered to leave the berth on December 18, 2020, and was not permitted to return to the berth until January 11, 2021;

(b) Further or alternatively, the Vessel was ordered to depart from the berth on January 20, 2021, prior to the completion of discharge.

**Loss and Damage**

20. By reason of Charterer's breach of the Charter, Owner suffered demurrage and/or damages for detention:

(a) **US$208,889** in additional demurrage was incurred pursuant to the terms of the Charter over and above that which Charterer has paid, for the period when it failed or refused to complete discharge of the Cargo after which Owner arranged for

        completion of discharge, which Charterer has wrongfully failed and refused to pay in breach of the Charter;

(b)     If, contrary to Owners' primary case, time on demurrage did not run while the Vessel was discharging the remaining part of the Bulk Cargo from her holds, then Charterer remains liable for damages for detention in like amount, the Vessel having been detained by Charterer's wrongful failure and refusal to discharge the remaining Bulk Cargo on board the Vessel.

21.     Further or alternatively, by reason of Charterer's failure and refusal in breach of the Charter to discharge fully the Bulk Cargo at City Dock 3, Owners incurred **US$67,906.25** in discharging and sending ashore the Bulk Cargo which Charterer wrongfully and in breach of the Charter failed and refused to discharge.

22.     Further or alternatively, by reason of Charterer's breach of its warranty and/or undertaking that City Dock 3 would be "*always accessible*", Owners incurred:

(a)     **US$33,927.96** in shifting and other costs incurred in departing from City Dock 3 on December, 18, 2020 and re-berthing on January 11, 2021;

(b)     **US$39,872.19** in extra dockage and security fees.

23.     Further or in the yet further alternative, by reason of Charterer's breach of its warranty and/or undertaking that City Dock 3 would be "*always accessible*", Charterer's failure to discharge all of the Bulk Cargo and/or Charterer's failure to discharge the Bulk Cargo within the allowed laytime, and/or in reasonable mitigation of such losses, Owner incurred **US$559,096.72** in trading and/or commercial losses as follows:

(a)     Prior to the call at Houston, Owner fixed the Vessel or a substitute to Pioneer Navigation Ltd for the carriage of a cargo of HSS from Houston to China by a

        voyage charter dated November 19, 2020 ("the Pioneer Fixture"), with a laycan of December 13 to 21, 2020.

(b)     As a result of the delays caused by Charterer's breach(es), it became evident to Owner that the Vessel would miss the said laycan under the Pioneer Fixture.

(c)     In reasonable mitigation of Owner's losses, on December 10, 2020, Owner came to the following agreement with The Andersons Inc ("Andersons"):

    (i)     Owner re-let the Pioneer Fixture to Andersons, who performed that fixture on the "Josco Guangzhou"; and

    (ii)     Andersons fixed the Vessel (or a substitute) from Owner to lift a cargo of sorghum out of the US Gulf with a laycan about 10 days later than that under the Pioneer Fixture (i.e.: between December 18 and 30, 2020; "the Andersons Swap Fixture").

In this way, and in reasonable mitigation of Owner's loss, there would be employment for the Vessel once she completed discharge of the Bulk Cargo at Houston, but Owner was also able to cover its commitments under the Pioneer Fixture which would (but for Charterer's breach) have been performed by the Vessel.

(d)     As a result, however, of the continuing delays at Houston due to Charterer's breach(es) as aforesaid, it later became clear to Owner that the Vessel would not be ready in time to deliver into the Andersons Swap Fixture within its cancelling date. On that basis:

    (i)     To perform the Andersons Swap Fixture, Owner had to charter in another vessel ("the MV Alam Sayang");

(ii) This in turn made it necessary to find alternative employment for the Vessel upon completion of discharge of the Bulk Cargo at Houston;

(iii) Owner fixed the Vessel out for a time charter trip to another company, Bunge SA, under a charterparty dated January 15, 2021 ("the Bunge Fixture"), with a laycan of January 29, to February 3, 2021 and delivery at the Southwest Pass. The Vessel duly performed the Bunge Fixture after completing discharge of the Bulk Cargo at Houston.

(c) By reason of the matters aforesaid:

(i) But for Charterer's breach(es), the Vessel would have performed the Pioneer Fixture, which would have produced a net profit calculated at **US$577,118;**

(ii) As aforesaid, Owner had to relet the Pioneer Fixture to Andersons, resulting in a net **loss** to Owner of **US$56,562**;

(iii) Owner then had to fix in the "MV Alam Sayang" to perform the Andersons Swap Fixture, resulting in a further net **loss** to Owner of **US$333,758.**

(iv) The Vessel herself performed the Bunge Fixture after discharge of the Bulk Cargo was completed, and returned a net profit of *US$338,341.28*.

(v) Accordingly, Owner's losses are as follows:

| | |
|---|---|
| Lost net profit on Pioneer Fixture using the Vessel | $557,118 |
| Net loss on Pioneer Fixture using "Josco Guangzhou" | 56,562 |
| Net loss on Andersons Swap Fixture using "Alam Sayang" | 333,758 |
| Net profit on Bunge Fixture using the Vessel | (388,341.28) |
| **Overall loss:** | **$559,096.72** |

24. Plaintiff thereby sustained damages in the total principal amount of **US$909,692.12**, plus estimated attorney's fees, costs, and interest.

**Pending Arbitration & Attorneys' Fees**

25. Clause 19 of the proforma GENCON 1994 form of the Charter provides that all disputes between the parties shall be submitted to arbitration in London, with English Law to apply thereto under the Arbitration Acts of 1950 and 1979. (Exhibit 1, page #17.)

26. Under English Law, pursuant to Section 61(2) of the Arbitration Act of 1996, costs follow the event; such costs to include the costs of arbitration and litigation, including attorneys' fees, costs, and expenses.

27. In accordance with the foregoing, Owner has commenced arbitration in London against Charterer, which is currently pending.

28. Owner has requested security from Charterer with respect to its damages, which Charterer has refused to provide.

29. Owner reserves all rights to seek increased security as may be needed in this proceeding. Likewise, Owner reserves all rights to seek and recover the full quantum of its damages, attorneys' fees, costs, interest and other expenses in arbitration in England.

## BREACH OF MARITIME CONTRACT UNDER U.S. LAW

30. Paragraphs 1 through 29 of this Verified Complaint are repeated and realleged as if the same were set forth here at length.

31. Charterer breached its obligations to perform under the Charter in the various ways set forth above, and breached the Charter by failing to make timely payments of the amounts that accrued as a result, as set forth above.

32. The Charter is a maritime contract under the General Maritime Law of the United States, as it is a voyage charter party for vessel services.

33. By failing to pay the amounts owed to Plaintiff, Defendant has thereby breached a maritime contract under the General Maritime Law of the United States.

## SUPPLEMENTAL RULE B ALLEGATIONS

34. Paragraphs 1 through 29 of this Verified Complaint are repeated and realleged as if the same were set forth here at length.

35. As set forth above, pursuant to the Charter Party, the underlying merits of the dispute are being resolved by arbitration in London. Owner expressly reserves all its rights to continue to arbitrate the merits of the underlying dispute.

36. Owner brings this action solely to obtain *quasi in rem* jurisdiction over Charterer, to secure the claims being pursued in the London arbitration more fully described above.

37. Upon information and belief, and after investigation, Charterer cannot be found within this District within the meaning of Supplemental Rule B. (*See* Accompanying Declaration of Nicholas W. Paine.)

38. Owner is accordingly entitled to attach Charterer's property within this District pursuant to the provisions of Supplemental Rule B of the Federal Rules of Civil Procedure.

39. Upon information and belief, Sesco Trading has or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees within the District which are believed to be or will be due and owing to Sesco Trading. (*Id.*).

40. Upon information and belief, the specific, known Garnishee holding assets due and owing to Sesco Trading or to be holding such assets is Sesco Cement, Corp. (although Owner reserves the right to amend and supplement with respect to additional Garnishees).

41. Upon information and belief, Sesco Trading is an affiliate of Sesco Cement, Corp., for whom Sesco Trading negotiated, acquired and/or otherwise facilitated the purchase and transport of the cement at issue and/or other property (see Ex. 2), and to which Sesco Cement, Corp. owes monies and/or will owe monies for services rendered, and Sesco Cement, Corp. is located within the District.

42. Plaintiff seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching, *inter alia*, any assets of Defendant held by garnishees within the District, specifically the Garnishee identified above, for the purpose of obtaining personal jurisdiction over Defendant and to secure Plaintiff's claims, as described above.

WHEREFORE, Plaintiff prays for the following:

(A) That process in due form of law issue against Defendant citing it to appear and answer under oath all and singular the matters alleged in this Verified Complaint, failing which default judgment be entered against it in the sum of $909,692.12 plus attorneys' fees, costs and interest;

(B) That since Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and

monies, tangible or intangible, or any funds up to the amount of $909,692.12, belonging to, due or being transferred to, from or for the benefit of Defendant, including, but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of garnishees to be named, and specifically the Garnishee identified herein, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Rule B answer the matters alleged in this Verified Complaint;

(C) That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

(D) That this Court recognize and confirm any award or judgment(s) rendered on the claims against Defendant set forth herein as a judgment of this Court;

(E) That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

(F) For such other and further relief as the Court deems just and proper.

Dated: May 12, 2022

                              Respectfully submitted,

                              */s/ Nicholas W. Paine*
                              Nicholas W. Paine
                              Attorney in Charge
                              Texas Bar No. 24083614
                              Fed ID: 2385694
                              215 Park Ave. South, 11th Floor
                              New York, New York 10003
                              Telephone: 917-882-4566

OF COUNSEL:
**Zeiler Floyd Zadkovich (US) LLP**
215 Park Ave. South, 11th Floor
New York, New York 10003
*Attorneys for Plaintiff*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Kevin Charman, declares as follows:

I am the Director of Operations of Plaintiff, Hudson Shipping Lines Inc and have been so affiliated at all times referred to in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. I verify that I believe the allegations contained therein to be true to my own knowledge, except as to matters stated to be upon information and belief, and as to those matters I believe them to be true. The grounds for my belief are based upon my personal knowledge gained during the course of my professional duties as the Director of Operations for Hudson Shipping Lines Inc, and my review of and familiarity with correspondence and other relevant documents, including the exhibits to the foregoing Verified Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 12th day of May, 2022 in Deerfield, Illinois.

_____
SIGNATURE